IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM F. McNEILL, PAIGE
McNEILL, MARILYN CATES
THE BLACK TRUST, LISA
McNEILL, and CATES FAMILY
LIMITED PARTNERSHIP,

        Plaintiffs,

vs.                                   CIVIL NO.   00-955 BB/LFG

PHILLIPS PIPELINE COMPANY
and PHILLIPS PETROLEUM
CORPORATION,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## ON PLAINTIFFS' MOTION TO COMPEL COMPLIANCE
## WITH RULE 30(b)(6) AND FOR SANCTIONS

THIS MATTER is before the Court on Plaintiffs' Motion to Compel Compliance with Rule 30(b)(6) Deposition Notice and Motion for Sanctions [Doc. 40]. The motion, response and reply were filed as a package on June 27, 2001. Oral argument is not necessary. This matter can be resolved based on the parties' submissions.

Plaintiffs' noticed a Rule 30(b)(6) deposition for the person or persons most knowledgeable on the following subjects: (1) whether the pipelines were pressurized prior to the time the leak was detected, and if so, the reason why they were pressurized, the extent of time over which they had been pressurized, along with the amount of pressure and the identities of the person(s) who made the decision to keep the lines pressurized; (2) what steps were taken prior to the time leaks were detected

to attempt to detect leaks; (3) the amount and nature of the material that has leaked and the extent to which soil and water have been contaminated; (4) whether the proposed remediation/ abatement technique has been used in other similar locations on leaks of similar size and material and, if so, what the results have been at each location; and (5) whether the Defendants have compensated landowners for similar leaks/contaminations and, if so, the details of the compensation provided.

Defendants designated Anthony Walker, a Phillips Pipeline Company environmental engineer, as its designated corporate representative to testify regarding the five subject matters enumerated.

Plaintiffs contend, "Mr. Walker displayed a serious lack of knowledge on a tremendous number of subjects that were plainly within the areas of inquiry noticed . . . ."  Defendants, on the other hand, state, "Mr. Walker provided complete and responsive answers to questioning on all of the subject areas, based on both his personal involvement with the crude oil pipeline releases and his communications with knowledgeable PPL employees."

The dispute is whether Defendants complied with the requirements to produce the person or persons most knowledgeable to testify on these subject matters, or whether Plaintiffs are simply dissatisfied with the answers they received, and would have preferred some other responses.

## Obligations Under Rule 30(b)(6)

Fed. R. Civ. P. 30(b)(6) allows a party to notice the deposition of a corporation and to specify the areas of inquiry.  Upon receipt of the notice, the named organization must designate one or more individuals to testify as to the areas of inquiry.  The individual thus identified by the corporation becomes the designated representative whose statements are treated as statements of the party.  Stone v. Morton International Inc., 170 F.R.D. 498, 501 (D. Utah 1997).

The corporation or organization must select an individual who can testify to the areas

2

specified in the notice.  Poole v. Textron, Inc., 192 F.R.D. 494, 503 (D. Md. 2000)(a corporation should make a "diligent inquiry" to determine the individual(s) best suited to testify).  The individual selected must be able to testify to all matters known or reasonably available to the corporation, Media Services Group, Inc. v. Lesso, Inc., 45 F. Supp. 2d 1237, 1253 (D. Kan. 1999), even if this necessitates gathering of documents or information and having individuals review or become familiar with the documents and information prior to the deposition.  Poole v. Textron, Inc.; Alexander v. Federal Bureau of Investigation, 186 F.R.D. 148, 151-52 (D.D.C. 1999).

If the designated individual, officer, director or managing agent fails to appear for a deposition or the corporation fails to provide a witness who can answer questions listed in the notice of deposition, then the corporation has failed to comply with its obligations under the rule and is subject to sanctions.  Reilly v. NatWest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999).

The intent of this rule is to ensure that the individual designated can testify as to the corporation's collective knowledge and information on the matters requested.  The corporation has a duty to gather the information and to prepare a representative so that the representative can provide knowledgeable and binding testimony.  Starlight International, Inc. v. Herlihy, 186 F.R.D. 626, 638 (D. Kan. 1999).

## The Deposition in Dispute

Plaintiffs complain that the deponent was unable to answer their questions.  Specifically, Plaintiffs contend that Mr. Walker, the deponent, did not know why no crude oil was shipped in the line after October, 1996, nor did he know whose decision it was that caused the cessation of shipments.  In support of their argument, Plaintiffs rely on page 13, lines 14 through 24 of the Walker deposition.  However, a review of the prior deposition page, page 12, shows that examining counsel's

questions concerning pressurization of the lines proceeded as follows:

QUESTION:   What knowledge and information [did you obtain]--
did you say his name was Red?

ANSWER:   S.V. Red Woodward.

QUESTION:   What knowledge did you gain from Mr. Woodward
regarding the subjects outlined in paragraph 1 of
Exhibit 1?

ANSWER:   The pipelines were pressurized at the times the leaks
were detected, both of them.  The reason they were
pressurized is, for the one we referred to at line NM-
1-1, that line was connected to, and is connected to
Arco Hobbs, where we received and delivered crude
oil from and to them, mostly from.  It is now owned
by Tipco, just to put that in there.

QUESTION:   Which is NM-1-1 is owned by Tipco [sic]?

ANSWER:   No, Arco–excuse me, the Arco Hobbs is now owned
by Tipco.  The reason it was pressurized is that we had
not taken deliveries from them for sometime, but there
was a possibility that we may, based on market
conditions.  It as a common practice to have the lines
available in a situation where we would want to
receive product from them again.

QUESTION:   How long had it been since Phillips had used this line
NM-1-1 to receive products--I'm sorry, to take
delivery of product from Arco?

ANSWER:   I'd like to reference the interrogatories on that, as
well.  I believe the date was October.

MR. HNASKO:  Let me just--for the record, I would like to show you
interrogatory 13, if that helps you at all.

ANSWER:   NM-1-1 received shipments between January and
October of 1996, and October of 1996 was the last
shipment that was made.

QUESTION:   Why were no shipments made after that date?

ANSWER:     I don't know the reasons--the business reasons why product was not received from them at that time.

QUESTION:   Do you know whose decision it was that caused no product to be received after that date on this line?

ANSWER:     No.

MR. HNASKO:  Just so the record is clear, you two need to be talking on the same universe.  I believe Mr. Lyle is maybe talking--asking whether that decision was a Phillips decision or an Arco decision.  I'm just trying to move things around.

ANSWER:     I don't know whose decision that was.

QUESTION:   And Mr. Hnasko, while maybe not acting with the confines of Rule 30 is correct.  That was the import of my question.

MR. HNASKO:  That's what I thought.

QUESTION:   You don't know whether it was Phillips or Arco who was responsible for the fact that after--I'm sorry, was it October?

ANSWER:     October of 1996.

QUESTION:   Up until the time the leak was detected, there had been no delivery of product using this pipeline from Arco to Phillips; is that a correct statement, you don't know whose decision that was?

ANSWER:     I do not know whose decision it was to not move product through that pipeline.

QUESTION:   And when you say that your understanding as to why the pipeline was kept pressurized after October of 1996, is because there was a possibility, you said, that there might be deliveries occurring? Did I understand your testimony correctly?

5

ANSWER:      Yes.

(Pages 12-14).

A fair reading of the questions and answers shows that Mr. Walker was able to respond to questions outlined in paragraph 1 of the 30(b)(6) notice.  He provided evidence that the pipelines were pressurized, that they were pressurized prior to the time the leak was detected, and the reasons why they were pressurized.  At least, in this portion of the deposition, no question was asked the deponent concerning the amount of pressure.  Nowhere in this 30(b)(6) deposition was the deponent required to prepare himself to answer the question as to whose decision it was not to have product received after a specified date.  The Court's examination of the interchange shows that Phillips fully complied with its obligations and that Plaintiffs' objections are not well-taken.

The second concern raised by Plaintiffs was that Mr. Walker did not know what market conditions caused delivery of crude oil to stop, referring to page 20, line 16 through 19.  In this example, as in the prior, an examination of the preceding page is necessary.  Commencing on page 19, examining counsel asks as follows:

QUESTION:   Is it your assumption that the reason delivery was stopped in this pipeline in October of 1996, had something to do with crude oil pricing, or do you know that for a fact?

ANSWER:      As I recall, my answer previously indicated it was based on market conditions.

QUESTION:   You recall your answer previously was that the delivery was stopped because of market conditions?

ANSWER:      I believe.   Could we please repeat my previous answers?

MR. HNASKO:  Let me object here again.  It has been asked and

6

answered.  You may testify to your personal know-
ledge and just do your best.  That's all you can do.

QUESTION:  I agree with Mr. Hnasko.

MR. HNASKO:  Do your best with your personal knowledge, no
matter how gained.

QUESTION:  If your personal knowledge is that delivery was
stopped because of market conditions, then that's
what I want to know.  Is that your knowledge?

ANSWER:     I believe that plays into it.

QUESTION:  Why did market conditions play into the decision to
stop delivery of product in this pipeline in October of
1996?

ANSWER:     I don't know.

(Pages 19-20).

Following this exchange, Mr. Walker's counsel objected, stating that these questions should

appropriately be put to the producer, Arco and their policies, as opposed to the oil transporter,

Phillips.

MR. HNASKO:  The questions you are asking are more appropriately
directed towards, Arco, the producers.  You are
asking for a transporter of product to answer
questions based on what Arco's policies may or may
not be, based on market conditions.  He can't do that.

(page 21, lines 13-18).

The Court agrees.  Again, Mr. Walker testified well within the scope of the notice of

deposition.  The reasons for market conditions that caused Arco to determine not to transport

products are not within the scope of the 30(b)(6) notice.  Indeed, nothing within the notice required

the deponent to be prepared on a discourse concerning market conditions and how prevailing market

7

conditions affect oil pricing or the decision to hold, deliver or not to deliver products. Plaintiffs'

objections are not well-taken.

Plaintiffs' next objection again concerns market conditions and what market conditions would

cause a change in the decision to place a line back into service. In support of their motion, Plaintiffs

refer to page 25, lines 9-23. Indeed, starting at the top of the page, the following exchange occurs:

QUESTION: And when Mr. Woodward asked you about the possibility of placing the lines back in service, can you give me any more detail as to what it was that he was asking exactly?

ANSWER: He was asking--I really can't speculate as to why he asked me if they could be placed back into service. He just did ask me if they could.

QUESTION: Did he give you information to suggest that market conditions had now changed to the point that whatever the reason was for stopping delivery no longer existed?

ANSWER: Something has changed.

QUESTION: That's the ownership?

ANSWER: Excuse me.

QUESTION: What has changed?

ANSWER: Something has changed to where they are asking if the lines may be placed back into service.

QUESTION: Do you know what has changed?

ANSWER: No, I do not know what has changed.

QUESTION: Do you know if whatever has changed, had changed prior to the time the leak was discovered?

ANSWER: I do not know that.

QUESTION:   So getting back to my question, since you don't know why delivery was stopped--.

ANSWER:   Okay.

QUESTION:   Since you don't know whether whatever has changed so that people are asking you about it now, had changed before the leaks were detected--.

ANSWER:   Okay.

QUESTION:   Can you tell me, based on your knowledge, that in fact, the lines were kept pressurized up until the time the leaks were discovered, because market conditions might change the situation that caused delivery to be stopped?

MR. HNASKO:  It has been asked and answered.  Objection.

ANSWER:   Yes, I can.

QUESTION:   What is that?  What can you tell me about that?

ANSWER:   I can tell you that standard practice is to not go in and make the line unusable.  We want it available if whatever changes that stops or recontinues the flow of crude.  We want the line available to do that.

(Pages 25 and 26).

The Court's review of this exchange indicates that the deponent was knowledgeable and able to answer questions within the scope of the notice provided Defendants.  Plaintiffs did not alert Phillips that they would require a deponent to testify on the factors that are to be considered in deciding to put oil products in a pipeline for delivery, or to reintroduce oil into the line.  Plaintiffs' objections are not well-taken.

Plaintiffs next complain that Mr. Walker's testimony was based on "Phillips standard practice" and that Mr. Walker had no personal knowledge on this subject.  Plaintiffs misstate Mr. Walker's

9

testimony.  The discussion regarding Defendants' standard practice commences on page 26.

> ANSWER:    I can tell you that standard practice is to not go in and
> make the line unusable.  We want it available if
> whatever changes that stops or recontinues the flow of
> crude.  We want the line available to do that.

> QUESTION:  We'll talk about standard practice in a second.  I want
> to know from you, before the leaks were discovered,
> specifically what change in market condition could
> have permitted product to flow again--to be delivered
> again in this pipeline?

> ANSWER:    That is outside the realm of my knowledge, the
> specifics.

(Pages 26 and 27).

It is clear that the deponent was talking about market conditions that affect the flow of oil

being outside his expertise.  In reference to the particular questions asked about the flow of oil in the

pipelines, the Mr. Walker stated on page 27, line 4.

> ANSWER:    I believe I have answered in general to the part that I
> could.

This answer was in response to examining counsel's insistence that the deponent discuss market

conditions that either stopped or would restart the flow of oil in the line.  As noted previously, this

deponent was not offered as a witness to discuss market conditions, and that area is outside the scope

of the notice.

Further, the deponent discussed information which he had from personal knowledge, as

opposed to information provided by others.  *See eg.,* page 28, lines 18-25, page 29, lines 1-11.  He

did candidly state that he had no personal knowledge whether "any other entity in the industry had

standard practices in keeping pipelines pressurized when the delivery of product ceased." *See* pages 29 and 30.

The Court's examination of the deposition shows that the deponent answered questions well within the scope of the notice and that Plaintiffs' objections are not well-taken.

The second area noticed in the deposition included "what steps were taken prior to the time the leaks were detected to attempt to detect leaks."  Plaintiffs argue that Mr. Walker did not know how pressure in the lines were gauged or if they were gauged at all.  In support of their argument, Plaintiffs refer to pages 31 and 32 of the deposition.  As before, the questioning on this general line commenced several pages before.  The deponent had already testified that the lines had been maintained pressurized.

> QUESTION:  So your testimony as to the reason the pipeline was kept pressurized is because that was industry standard, is based upon, A, your recollection that you've seen Phillips do that with other pipelines, although, you can't tell me any; is that correct?
>
> ANSWER:    Yes.
>
> QUESTION:  And, B, what Mr. Stevenson, your supervisor, told you?
>
> ANSWER:    Yes.
>
> QUESTION:  Anything else?
>
> ANSWER:    No.
>
> QUESTION:  What was the amount of pressure maintained in the lines between when deliveries ceased and when the leaks were discovered?
>
> ANSWER:    Approximately, varying from 100 to 260 PSI, based on conversation with Red Woodward.

11

QUESTION:   Did you, yourself, before you spoke with Mr. Woodward, have any actual knowledge, based on your job experience, as to what amount of pressure was kept in the lines?

ANSWER:   Yes.

QUESTION:   And how was that?

ANSWER:   Based on my type of work, I have to use pressures in certain calculations, or in discussions with other persons.   So I know a general range of where pressures are in the gathering field.

QUESTION:   Are you assuming that these pipelines, NM-1-1 was maintained within that general range of pressures from the time delivery ceased until the time the leaks were discovered, or do you know that for a fact?

ANSWER:   I do know that for a fact.

QUESTION:   And your basis for that is what?

ANSWER:   Talking to Red Woodward.

QUESTION:   Is that the complete extent of your knowledge on that?

ANSWER:   Yes.

QUESTION:   You never reviewed any meter readings or logs that showed actually what the pressure was during that time; is that correct?

ANSWER:   No, I did not.

QUESTION:   Do you know how pressure in this pipeline was measured or gauged?

ANSWER:   Specifically no.

QUESTION:   Do you know if it was gauged at all, other than Mr. Woodward told you it was?

ANSWER:      I don't know the system on how they do that.

(Pages 30 and 31).

Mr. Walker was able to offer testimony concerning the range of pressure used on the pipelines, when the pipes were pressurized, the reason why they were pressurized and the amount of pressure.  Plaintiffs complain that Mr. Walker based his testimony on information that others told him rather than his personal reading of gauges or log books.  However, under Rule 30(b)(6), a corporation meets its obligation if it gathers information so that the designated representative can answer the questions.  Here, one source from which Mr. Walker gathered his information was his conversations with others.  Starlight International, Inc. v. Herlihy.  This is not a situation where the corporation failed to gather information, rather, Plaintiffs believe that the source of the information is not as reliable as if Mr. Walker had actually read gauges or reviewed logs showing specific pressures on specific dates.  The objections are without merit and are overruled.

Plaintiffs also complain that the only method of inspection that Mr. Walker had any knowledge of was visible inspection by people in airplanes and that Mr. Walker did not know if the line was flown between the time delivery of crude oil was stopped and when the leaks were discovered, and had no idea of the flying schedule.

The inquiry concerning efforts to detect leaks appears to start on page 36.

QUESTION:  Prior to the time the leaks were detected, what attempts were made to detect leaks?

ANSWER:      Visual observations

QUESTION:  By whom?

ANSWER:      Line flyers.

13

> QUESTION:   You are talking about airplanes--or people in airplanes?
>
> ANSWER:   People in airplanes who fly the entire length of the pipeline.

(Pages 36 and 37).

Mr. Walker was able to describe the process more specifically.

> QUESTION:   And how, to your understanding, does flying the lines achieve the goal of detecting the leak?
>
> ANSWER:   Basically, they fly at a low elevation and observe the pipeline right-of-ways for discoloration of vegetation or surface staining.
>
> QUESTION:   At what altitude do they fly?
>
> ANSWER:   I believe--and I have flown with them once before--the time we went, it was fairly low.  I don't know the exact number.  And then in an instance when they see something that they want to look at again, they loop around and fly even lower.
>
> QUESTION:   When you say "fairly low" do you know if they fly above or below a certain altitude?
>
> ANSWER:   It was hard for me to gauge.  I would think no more than 100 yards, 300 feet.

(Pages 38 and 39).

It was clear that Mr. Walker was aware of the method of pipeline inspection, how line flyers examine pipe lines, what they look for, and had general information concerning the altitude at which these observations occur.  However, when asked about the details of pipeline fly-over scheduling, and what the schedule was, he professed that at one time he knew, but he could not recall.  He did not know whether the line was scheduled to be flown between the time when delivery of products

14

stopped and when the leak was discovered.

Again, this is not an instance where a deponent who is produced by a defendant has no knowledge or has not taken steps to be prepared for a deposition. The deponent clearly answered questions concerning steps taken to inspect the lines. While he may not have had detailed information on the altitude the inspection plane flies, or the frequency of the flights, it is clear he had information concerning the steps taken to detect leaks. The Court determines that Plaintiffs' objections as to this portion of the deposition are not well-taken.

Plaintiffs argue that Mr. Walker testified that there should have been some sort of method in place to determine if there were changes in pressure that would indicate a leak in the pipeline, but he was precluded from offering his personal knowledge as opposed to corporate knowledge. In support of their objections, Plaintiffs refer to page 40. The examination on page 40 is a continuation of examining counsel's questioning concerning what line flyers look for while inspecting pipelines.

QUESTION:   And you say that to your knowledge this method of
            detecting leaks is accomplished by looking to see--I
            think you said, if there is discoloration?

ANSWER:     Discoloration of vegetation, or surface discolorations
            on the ground.

QUESTION:   And do you know what distance from the surface
            product has to come for this method of leak detection
            to be effective?

[OBJECTION]

QUESTION:   Do you understand my question?

ANSWER:     Not exactly. I think what you are asking is to what
            level the oil would have to come before you would
            notice vegetation discoloration on the surface?
            Because, obviously, the oil has to come to the surface

15

to notice a surface stain.  So in relation to vegetation, I don't know at what point it would cause a discoloration in the vegetation.

QUESTION:  Who, to your knowledge, knows that?

ANSWER:  I do not know.

(page 39, lines 12-25)

QUESTION:  I take it, based on what you just told me, that to your knowledge, Phillips Pipeline Company did not, during the time between when delivery of product was stopped and when the leak was discovered make any effort to measure whether there were changes in pressure in the line that were indicative of a leak; is that correct?

ANSWER:  I think that would be a bad assumption on your part.

QUESTION:  Why?

ANSWER:  I don't know the other steps of pressure monitoring.

QUESTION:  On this pipeline?

ANSWER:  That they may have had.

(page 40, lines 1-14).

Plaintiffs object to the responses, stating, "Only three (3) methods of leak detection were possible.  Mr. Walker didn't know anything about any of them with respect to what actually was done on this pipeline."  (Memorandum, p. 5).  While there may or may not be other methods of leak detection, Mr. Walker testified as to Defendants' efforts to detect leaks via visual observation through use of line flyers.

Mr. Walker was not ill prepared to respond to questions nor was he unable to respond to the questions within the scope of the notice presented.  Plaintiffs arguments evidence dissatisfaction with

16

his responses.  Mere dissatisfaction with a deponent's answers, or the fact that a deponent's answers may not mesh with  the opposing party's theory of the case does not support a claim that Rule 30(b)(6) was violated.

Plaintiffs do argue, however, that defending counsel instructed the witness not to answer a particular question.  The interchange involving this objection appears on pages 39-41 of the deposition.  Examining counsel sought to obtain information concerning what level the oil would have to come [up] before you would notice vegetation discoloration on the surface. The witness testified that he did not know.  Examining counsel then sought to determine if Phillips Pipeline Company engaged in "any effort to measure whether there were changes in pressure in the line that were indicative of a leak . . . ."  The colloquy is as follows.

ANSWER:      I don't know the other steps of pressure monitoring.

QUESTION:  On this pipeline?

ANSWER:      That they may have had.

QUESTION:  Who is likely to know that?

ANSWER:      I don't know exactly who would be likely to know the answer to that question.

QUESTION:  What effort did you make, in preparation for your deposition here today, to learn what other steps, or methods of pressure monitoring may have been in place to detect leaks in this pipeline?

ANSWER:      I base that on my knowledge, or general knowledge of that area, regionally.

QUESTION:  Based on your general knowledge regionally, what steps should have been in place to monitor pressure changes indicative of a leak?

> MR. HNASKO:  I'm going to object to that and direct you not to
> answer that question, because you are not here as an
> expert.  You are here as a fact witness on behalf of the
> company.
>
> QUESTION:  Are you going to follow Mr. Hnasko's instruction not
> to answer?
>
> MR. HNASKO:  He is going to follow my instruction.  You can re-
> phrase your question and get the same information in
> a different manner.
>
> QUESTION:  Are you going to refuse to answer the question?
>
> ANSWER:     Yes.

(Pages 40 and 41).

Phillips argues that the instruction not to answer the question was appropriate for several

reasons.  First, counsel was not asking for the corporation's knowledge, but Mr. Walker's personal

knowledge.  Secondly, Phillips argues that the question sought an impermissible opinion rather than

disclosure of facts.

While both objections are valid and may appropriately be raised at trial, they are impermissible

during discovery.  Rule 30(c) specifically addresses this issue.  The Rule provides in part:

> All objections made at the time of the examination to the qualifications
> of the officer taking the deposition, to the manner of taking it, to the
> evidence presented, to the conduct of any party, or to any other aspect
> of the proceedings shall be noted by the officer upon the record of the
> deposition; but the examination shall proceed, with the testimony
> being taken subject to the objections.

In Resolution Trust Corp. v. Dabney, 73 F.3d 262 (10th Cir. 1995), the Tenth Circuit adopted

an approach taken in American Hangar, Inc. v. Basic Line, Inc., 105 F.R.D. 173 (D. Mass. 1985),

concerning instructions not to answer.

18

> There is no question but that the instructions not to answer were improper. Rule 30(c), Fed. R. Civ. P., provides in pertinent part: Evidence objected to *shall be taken* subject to objection. This rule means that, as a general rule, instructions not to answer are improper. The only exceptions are those canvassed in the recent case of <u>International Union of Electrical, Radio & Machine Workers, AFL-CIO, et al. v. Westinghouse Electric Corporation</u>, 91 F.R.D. 277 (D.D.C. 1981) and deal with questions which seek information in the form of trade secrets and privileged information. Even in the case of questions of this type, it is the duty of the attorney instructing the witness not to answer to immediately seek a protective order. [Emphasis in original].

<u>Id.</u> at 174.

As noted, this is the approach adopted by the Tenth Circuit in <u>Dabney</u>. There, our circuit stated:

> Under the plain language of Fed. R. Civ. P. 30(d)(1), counsel may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to suspend a deposition in order to present a motion under Fed. R. Civ. P. 30(d)(3). It is inappropriate to instruct a witness not to answer a question on the basis of relevance.

<u>Id.</u> at 266.

In this case, there is no contention that examining counsel called for disclosure of privileged information; there is no contention that the Court previously limited the scope of the deposition and that the question called for evidence previously limited by the Court's order; and, finally, there is no contention that Mr. Hnasko instructed the witness not to answer so that he could seek a protective order. Thus, under <u>American Hangar</u>, <u>Dabney</u> and Rule 30(c), Mr. Hnasko's directive not to answer the question was improper.

The Court's remedy is to direct one of two things. First, examining counsel may pose the same question to the deponent by way of written question and the Court will require Mr. Walker to

19

answer, under oath, in writing.  Alternatively, the Court will allow the deposition to be reconvened with the reporter's appearance fee for the new deposition to be borne by Phillips.  Examining counsel may then ask that question and obtain the deponent's response.  Once the response is given, the deposition may be terminated.

The Court determines that there is no basis for sanctions in connection with alleged violations of Rule 30(b)(6), and none will be entered.  The Court further determines that, on the issue concerning an instruction not to answer, the sanction of requiring Defendant to pay for the reporter's cost of the new deposition, should Plaintiffs desire to reconvene to ask that question, is sufficient and no other sanction will be ordered.

The Court denies both parties' requests for costs and fees.

Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEYS FOR PLAINTIFFS:
Royce E. Hoskins, Esq.
James P. Lyle, Esq.

ATTORNEYS FOR DEFENDANTS:
Richard E. Olson, Esq.
Harold L. Hensley, Jr., Esq.
Albert L. Pitts, Esq.
Thomas M. Hnasko, Esq.